1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DARRELL LOWE,                          )   Case No. 1:09-cv-00712 AWI JLT (PC)
                                            )
12              Plaintiff,                   )   FINDINGS AND RECOMMENDATIONS
                                            )   THAT DEFENDANT'S MOTION TO
13       vs.                                )   DISMISS, CONVERTED BY THE COURT
                                            )   TO A MOTION FOR SUMMARY
14   WILLIAM J. MCGUINNESS, et al.,          )   JUDGMENT, BE GRANTED
                                            )
15              Defendants.                  )   (Docs. 49, 76)
     _____        )

16

17          Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C.

18   § 1983.  Plaintiff claims that Defendant Rahimifar provided him inadequate medical care in violation

19   of the Eighth Amendment.  Now pending before the Court is Dr. Rahimifar's motion to dismiss which

20   the Court has converted previously to a motion for summary judgment.[1]  (Docs. 49, 76)  Plaintiff filed

21   an opposition to the motion to dismiss and the converted motion for summary judgment. (Docs. 56, 79)

22   For the reasons set forth below, the Court recommends that Defendant's motion for summary judgment

23   be **GRANTED**.

24   **I.      BACKGROUND**

25          **A.      Factual Background**

26          In 2006 and 2007, Plaintiff was housed at CSP-Corcoran.  Due to having severe degenerative

27

28   _____
          [1]Defendant Rahimifar does not join the instant motion, however has filed a Motion to Dismiss which is currently
     pending before the Court.  (Doc. 49.)

                                                    1

disc disease, he was seen by medical professionals outside of the facility.   Dr. Rahimifar, a neurosurgeon, had privileges at Mercy Hospital and Memorial Hospital in Bakersfield, California. (Doc. 61 at 1-2) As a result, he was asked to see Plaintiff several times from 2004 through 2007.  Id.  Dr. Rahimifar was not contracted with the CDCR at any time though, apparently, both of these hospitals were.  Id. at 1.

Plaintiff alleges that on June 22, 2006, Dr. Rahimifar performed surgery on Plaintiff to address his spinal degenerative disc disease.  (Doc. 56 at 13-14) This surgery involved multiple repairs to Plaintiff's spine including the placement of a "bone graft followed by bilateral pedicular and screw fixation under AP and lateral fluroscopic monitoring L4, L5 and S1."  Id, at 13.  In addition, Dr. Rahimifar was forced to implant a "titanium threaded cage from Zimmer packed with autologous bone graft front and back."  Id. at 14.  This was required due to "significant disk induced instability."  Id.

On November 21, 2006, Dr. Rahimifar again saw Plaintiff and determined that the "lower underbody cage ha[d] migrated backward into the spinal canal about 1 cm."[2]  (Doc. 56 at 15) Dr. Rahimifar talked with Plaintiff about conducting a new surgery to reposition the titanium cage and Plaintiff reported that he desired the surgery.  Id.  This surgery occurred on April 30, 2007.  Id. at 19. However, when the surgery began, Dr. Rahimifar determined that plaintiff's condition had deteriorated significantly from the time of the previous surgery and determined that he would not be able to proceed. Id. at 18.  Instead, Defendant determined that to correct the dislodged titanium cage, a new surgery would be required in which a vascular surgeon would need to create an anterior approach to the cage and clear the way for the neurosurgeon to perform the repair.  Id.  This surgery occurred on December 27, 2007 and was successful. Id. at 31.

Nevertheless, Plaintiff sued Dr. Rahimifar for various claims but the Court dismissed most of them on September 28, 2009. (Doc. 9) Only one claim against Dr. Rahimifar survived.  The Court found cognizable only Plaintiff's claim that Dr. "Rahimifar intentionally left a"screw loose in my spine for the purpose of gaining more money from State by showing more surgery is needed" and because he was instructed to do so by other defendants no longer involved in this case. (Doc. 1 at 10; Doc. 9 at 2-3) In

_____

[2]The medical records demonstrate that the titanium cage was dislocated "after he got into a fight, an altercation, which moved his cage . . ."  (Doc. 56 at 34)

1   the Court's September 28, 2009 order, the Court observed,

2   > With respect to defendant Rahimifar, **Plaintiff's allegations that defendant Rahimifar**
3   > **recommended and prescribed treatment[s] for Plaintiff that were not followed**
    > **through by other prison officials does not support a claim of deliberate indifference**
4   > **against him. The facts pled suggest that defendant Rahimifar attempted to treat**
    > **Plaintiff for his medical conditions.** Nevertheless, Plaintiff states a cognizable claim
5   > against defendant Rahimifar for violation of the Eighth Amendment, based on Plaintiff's
    > allegation that defendant deliberately left a screw loose during Plaintiff's surgery in order
6   > to be paid to perform a second surgery.

7   Id. at 3, emphasis added.  Notably, Plaintiff now contends, not that Dr. Rahimifar left a screw loose in

8   his spine but that, "It is obvious that a screw came loose or his spine came loose in order for the cage

9   to migrate backwards . . ."  (Doc. 56 at 2) He attributes this occurrence to Dr. Rahimifar's failure to

10  ensure that the medical professionals at CSP-Corcoran followed Dr. Rahimifar's discharge instructions.

11  Id. at 3-4.

12  **II.      LEGAL STANDARDS**

13      **A.      Summary Judgment**

14      Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials

15  on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

16  is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one which may

17  affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute

18  regarding a material fact is genuine if the evidence is such that a reasonable trier of fact could return a

19  verdict in favor of the nonmoving party.  Id.

20      A party seeking summary judgment "always bears the initial responsibility of informing the

21  district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

22  answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

23  demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317,

24  323 (1986) (internal quotation marks omitted).  Where the movant will have the burden of proof on an

25  issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for

26  the moving party."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). "On an issue

27  as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely

28  by pointing out that there is an absence of evidence to support the nonmoving party's case."  Id. (citing

1 | Celotex, 477 U.S. at 323).

2 | If the movant has sustained its burden, the nonmoving party must "show a genuine issue of

3 | material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." FTC v.

4 | Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (citing Anderson, 477 U.S. at 257 (1986)) (emphasis in

5 | the original).  Although the nonmoving party need not establish a material issue of fact conclusively in

6 | its favor, it may not simply rely on "bald assertions or a mere scintilla of evidence in [its] favor" to

7 | withstand summary judgment.  Stefanchik, 559 F.3d at 929.  Indeed, "[w]here the record taken as a

8 | whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue

9 | for trial.'"  Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation

10 | omitted).

11 | In resolving a summary judgment motion, "the court does not make credibility determinations

12 | or weigh conflicting evidence."  Soremekun, 509 F.3d at 984.  Rather, "the evidence of the [nonmoving

13 | party] is to be believed, and all justifiable inferences are to be drawn in [its] favor."  Anderson, 477 U.S.

14 | at 255.  See T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n, 809 F.2d 626, 630-31 (9th

15 | Cir. 1987).  Inferences, however, are not drawn out of the air; it is the nonmoving party's obligation to

16 | produce a factual predicate from which the inference may justifiably be drawn.  Richards v. Nielsen

17 | Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

18 | **III.    DISCUSSION**

19 | **A.    The Court finds good cause to allow service of the complaint beyond 120 days**

20 | Dr. Rahimifar argues that the Court lacks personal jurisdiction because he was not served within

21 | the 120-day period required by Fed. R. Civ. P. 4 such that the matter must be dismissed.  Notably, the

22 | Court directed this service on June 25, 2010 (Doc. 14) but then granted the other Defendants' motion

23 | to stay the action on September 30, 2010.  (Doc. 18) The matter remained stayed until November 23,

24 | 2010. (Doc. 22) On March 14, 2011, the U.S. Marshal Service provided a mailed copy of the summons

25 | and complaint, directed to Dr. Rahimifar, at Mercy Hospital.  (Doc. 45) As noted by Dr. Rahimifar,

26 | Mercy Hospital is a location where he treated Plaintiff but this was not Defendant's regular place of

27 | business. (Doc. 61 at 2)  Dr. Rahimifar explains that he had privileges at the hospital only.  Id. Dr.

28 | Rahimifar argues that because Plaintiff failed to provide the U.S. Marshal Service with his correct

1  business address, the delay in completing service, requires dismissal of the action.  (Doc. 49-1 at 3-4)

2      Notably,

3      "An incarcerated pro se plaintiff proceeding in forma pauperis is entitled to rely on the
       U.S. Marshal for service of the summons and complaint and . . . should not be penalized
4      by having his action dismissed for failure to effect service where the U.S. Marshal or the
       court clerk has failed to perform his duties . . . ." Puett, 912 F.2d at 275. So long as the
5      prisoner has furnished the information necessary to identify the defendant, the marshal's
       failure to effect service "is automatically good cause within the meaning of Rule 4(j)."
6      Sellers v. United States, 902 F.2d 598, 603 (7th Cir. 1990) (internal quotations omitted).

7  Thus, an incarcerated Plaintiff need provide only information sufficient to *identify* the Defendant, he

8  need not provide a specific location for service.  Walker v. Sumner, 14 F.3d 1415, 1422 (9th Cir. Nev.

9  1994).  Here, Plaintiff reported to the U.S. Marshal Service that Defendant was a neurosurgeon and

10 identified Mercy Hospital as the place where he practiced.  (Doc. 45) Though, of course, Mercy Hospital

11 was not Dr. Rahimifar's business address, Dr. Rahimifar admits that his business address was readily

12 ascertainable given that he has been at this address since 1995.  (Doc. 61 at 1) Indeed, there is no

13 indication from the U.S. Marshal Service that Dr. Rahimifar was unidentifiable and, in fact, the USMS

14 was able to locate Dr. Rahimifar given that he received personal service of the summons and complaint.

15 (Doc. 45)

16     Given this, the Court finds that Plaintiff met his obligations toward service of the complaint.

17 Consequently, the Court finds there was good cause to allow the service beyond 120 days after the order

18 requiring service upon Dr. Rahimifar.  Therefore, the Court recommends that Dr. Rahimifar's motion

19 for summary judgment for lack of personal jurisdiction, be **DENIED**.

20     **B.      Dr. Rahimifar did not act under color of state law when he treated Plaintiff**

21     As noted above, a defendant may be held liable under 42 U.S.C. § 1983 only if, when he imposed

22 the constitutional deprivation, he did so under color of state law.  West v. Atkins, 487 U.S. 42, 48

23 (1988); Collins v. Womancare, 878 F.2d 1145, 1147 (9th Cir. 1989).  Private citizens can be liable under

24 Section 1983 if he was a "willful participant in joint activity with the State or its agents." United States

25 v. Price, 383 U.S. 787, 794 (1966).  In West, the Court held that a doctor who was contracted with the

26 state to provide medical services to inmates at a state prison hospital, acted under color of state law when

27 he treated an inmate. Id. at 55. The Court held, "The traditional definition of acting under color of state

28 law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law

5

1    and made possible only because the wrongdoer is clothed with the authority of state law.'" Id. at 49. The

2    Court continued,

> North Carolina employs physicians, such as respondent, and defers to their professional
> judgment, in order to fulfill this obligation. By virtue of this relationship, effected by
> state law, Doctor Atkins is authorized and obliged to treat prison inmates, such as West.
> [Footnote] He does so "clothed with the authority of state law." United States v. Classic,
> 313 U.S., at 326. He is "a person who may fairly be said to be a state actor." Lugar v.
> Edmondson Oil Co., 457 U.S., at 937. It is only those physicians authorized by the State
> to whom the inmate may turn. Under state law, the only medical care West could receive
> for his injury was that provided by the State. If Doctor Atkins misused his power by
> demonstrating deliberate indifference to West's serious medical needs, the resultant
> deprivation was caused, in the sense relevant for state-action inquiry, by the State's
> exercise of its right to punish West by incarceration and to deny him a venue independent
> of the State to obtain needed medical care.

10   Unlike in West, here Dr. Rahimifar was not contracted with the state.  (Doc. 61 at 1) Instead,

11   apparently, the two hospitals where he had privileges had contracts with the CDCR to provide

12   neurosurgical care to inmates.  Dr. Rahimifar treated Plaintiff only at these physical locations; he never

13   treated Plaintiff at any CDCR location or prison.  Id. at 1-2. As a result, he never treated Plaintiff in a

14   medical setting "in keeping with the security regulations" of any facility.  West, at 57 ("'[T]he delivery

15   of medical services in the nation's prisons and jails is beset with problems and conflicts which are

16   virtually unknown to other health care services.'") quoting M. Wishart & N. Dubler, Health Care in

17   Prisons, Jails and Detention Centers: Some Legal and Ethical Dilemmas 4 (1983).

18   Likewise, there is no indication that Dr. Rahimifar was aware that the hospitals had entered into

19   these contracts or, if he did, that he became a party to either contract. Though it appears that he accepted

20   a referral from the hospital and/or the CDCR to provide neurosurgical consultation and treatment, there

21   is no other indication that Dr. Rahimifar had any other contact with the CDCR or that he provided any

22   regular medical treatment to any other inmates.

23   On the other hand, the fact that Dr. Rahimifar was identified in the settlement agreement issued

24   in the Kings County Superior Court matter (Doc. 56 at 29), did not obligate him to treat Plaintiff nor

25   does it imply that a contract exists between the CDCR and Dr. Rahimifar.  In fact, the agreement merely

26   states the aspirations of the parties to the agreement that Plaintiff would see Dr. Rahimifar.  Importantly,

27   the agreement does not promise that Dr. Rahimifar would treat Plaintiff and assures Plaintiff *only* that

28   within 60 days he would be "examined by Dr. Rahimifar **or a Board Certified Neurosurgeon** [to]

6

provide treatment, prescriptions, physical therapy, surgery, [or] as needed. Id., emphasis added.  Thus, the CDCR could have fulfilled its obligations under the settlement agreement even if Plaintiff never again saw Dr. Rahimifar.  Notably, there is no indication that Dr. Rahimifar was consulted during the settlement negotiation or consented to seeing Plaintiff.  Thus, the mere fact that the parties indicated that they desired Dr. Rahimifar–or any other Board Certified Neurosurgeon–to provide medical care to Plaintiff, provides no support that when Dr. Rahimifar did see Plaintiff again, that he did so under color of state law.

For all of these reasons, the Court concludes that Dr. Rahimifar did not act under color of state law when he provided neurological treatment and surgery to Plaintiff.  See Sanchez v. Smith, 2006 U.S. Dist. LEXIS 37831 at * 4-7 (W.D. Wash. May 24, 2006) (Private doctor did not act under color of state law when he accepted a referral from the Department of Corrections); Nunez v. Horn, 72 F.Supp.2d 24, 27 (N.D.N.Y.1999).  Therefore, the Court recommends that Dr. Rahimifar's motion for summary judgment be **GRANTED**.

**C.      Eighth Amendment – Inadequate Medical Care**

Though the Court finds that Dr. Rahimifar was not acting under color of state law when he treated Plaintiff, the Court would recommend the motion for summary judgment be granted in any event because there is no evidence that Dr. Rahimifar violated Plaintiff's Eighth Amendment rights.

To establish a violation of the Eighth Amendment based on inadequate medical care, a plaintiff must demonstrate "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  In other words, Plaintiff must show the existence of (1) a serious medical need and (2) a deliberately indifferent response by the defendant.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

A medical need is serious "if the failure to treat the condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997).  Indications that a person has a serious need for medical treatment include: the existence of an injury that a reasonable doctor or patient would find worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic

7

1 and substantial pain.  McGuckin, 974 F.2d at 1059-60 (citations omitted).

2          A defendant acts with deliberate indifference when he knowingly fails to respond to a serious

3 medical need, thereby inflicting harm on the plaintiff.  See Farmer v. Brennan, 511 U.S. 825, 837-42

4 (1994); Jett, 439 F.3d at 1096.  Deliberate indifference may appear when a defendant denies, delays, or

5 otherwise interferes with medical treatment.  See Hutchinson v. United States, 838 F.2d 390, 394 (9th

6 Cir. 1988).  Nevertheless, "[d]eliberate indifference is a high legal standard."  Toguchi v. Chung, 391

7 F.3d 1051, 1060 (9th Cir. 2004).  "Mere 'indifference,' 'negligence,' or 'medical malpractice' will not

8 support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980)

9 (citing Estelle, 429 U.S. at 105-06).

10          In his opposition to the motion, Plaintiff no longer contends that Dr. Rahimifar left the screw

11 loose during the surgery.  (Doc. 56 at 2-4; Doc. 79 at 2-4)  Now he claims that the screw *became* loose

12 at some point after the surgery.  Id.  Consistent with Plaintiff's current position, the surgical notes

13 submitted by Plaintiff, demonstrate that the surgery was successful and the screw was installed properly.

14 (Doc. 56 at 13-14 ("Under fluroscopic monitoring, pedicular screw fixation was performed at L4, L5 and

15 S1 **without any difficulties. The construct was solid.**") emphasis added.)  Moreover,  the records

16 indicate that Plaintiff admitted that various activities at the prison caused need for the second and third

17 surgeries.  Id. at 17.  In particular, Plaintiff reported that he was repeatedly required "to bend for search"

18 which was consistent with the degeneration that Dr. Rahimifar found when he began the second surgery.

19 Id. at 17-18.  Dr. Rahimifar concluded, "He must have been bending frequently and caused this."  Id. at

20 18. On the other hand, Plaintiff reported that he had gotten into a physical fight after the first surgery

21 which caused the cage displacement and reported, "After that he had continued low back pain even

22 though on the chart, Dr. Abazari saw him and said he was doing fine in March of this last year.  He now

23 complains that he has had pain off and on continually since the surgery, and he had been involved in

24 multiple altercations and fights.  The last fight was 11/05/2008."  Id. at 34.

25          Plaintiff's current argument relies upon his assertion that the looseness of the screw was caused

26 by the failure of CSP-Corcoran to follow the discharge instructions issued by Dr. Rahimifar and/or Dr.

27

28

Rahimifar's failure to interject himself into Plaintiff's aftercare.[3] Id.  However, as noted above, the claim that Dr. Rahimifar failed to oversee Plaintiff's recovery at Corcoran, was dismissed by the Court on September 28, 2009.[4]  (Doc. 9) Nevertheless, all of the surgical notes, supplied by Plaintiff demonstrate the Dr. Rahimifar was not deliberately indifferent to Plaintiff's condition.  (Doc. 56 at 14-19, 31-32-35) Instead, the records demonstrate the Dr. Rahimifar employed his skills in such a fashion as to alleviate Plaintiff's pain and remediate his spinal injury.  Id.

Because there is no evidence that Dr. Rahimifar left the screw loose in Plaintiff's spine during the surgery and because Plaintiff now admits that the screw *became loose* due to insufficient recovery provisions, the Court recommends that Dr. Rahimifar's motion for summary judgment be **GRANTED**.

**IV.    CONCLUSION**

For the reasons set forth above, it is **HEREBY RECOMMENDED** that Defendant's April 21, 2011 motion to dismiss, which was converted by the Court into a motion for summary judgment (Docs. 49, 76), be **GRANTED**.

These findings and recommendations are submitted to the United States District Judge assigned to the case pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within **21 days** after being served with these findings and recommendations, any party may file and serve written objections with the Court. A document containing objections should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be filed and served within **14 days** of the date of service of the objections.  The parties are forewarned that the Court does not intend to grant extensions of time for this purpose absent a clear showing of good cause.

///

///

///

[3]Once again, all claims that Dr. Rahimifar failed to ensure that other defendants provided Plaintiff sufficient after-surgery care **have been dismissed by the Court**.  The mere fact that Dr. Rahimifar was mentioned in a settlement of a case in which he was not a party will not impose liability under the Eighth Amendment. (Doc. 56 at 29)

[4]Moreover, such a claim is not grounded in the realities of Plaintiff's situation.  Plaintiff is in the care custody and control of the CDCR.  Thus, Dr. Rahimifar had no authority to treat Plaintiff or to monitor his care.  Indeed, unless the CDCR granted permission, Dr. Rahimifar could not even enter the prison grounds let alone have contact with Plaintiff.

1          The parties are also advised that failure to file objections within the specified time may waive

2    the right to appeal the District Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3

4    IT IS SO ORDERED.

5    Dated:   __March 26, 2012__                              ____/s/ Jennifer L. Thurston____
                                                              UNITED STATES MAGISTRATE JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28